IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEFFREY N. BOOKER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 4:10-cv-00145 |
| | : | |
| CAROLYN W. COLVIN, ACTING | : | Hon. John E. Jones III |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

**August 27, 2014**

## Introduction

Plaintiff Jeffrey N. Booker has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Booker's claims for social security disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. Booker met the insured status requirements of the Social Security Act through March 31, 2010. Tr. 26.[1]

---

[1] References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Defendant's Answer.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes).  It is designed to help aged, blind or other disabled individuals who have little or no income.  Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

Booker filed his application for disability insurance benefits on December 8, 2004,[2] alleging that he became disabled on October 1, 2004.  Tr. 26, 534.  Booker has been diagnosed with numerous impairments, including insulin dependent diabetes mellitus, lumbar disc disease, obstructive sleep apnea, obesity, coronary artery disease, degenerative joint disease of the shoulder, high blood pressure, high cholesterol, GERD, depression, post-traumatic stress disorder ("PTSD"), borderline personality disorder, and substance abuse in remission.  Tr. 26.  On March 29, 2005, Booker's application was initially denied by the Bureau of Disability Determination.  Tr. 613.

Hearings were conducted by an administrative law judge ("ALJ") on January 18, 2006, February 22, 2006 and again on January 29, 2008; Booker was represented by counsel at all hearings.[3]  Tr. 957-75, 978-90, 993-1026.   On April

---

[2] This case was consolidated with a later filing, wherein Booker also applied for supplemental security income benefits.  Tr. 23, 98, 103.

[3] The ALJ cut short Booker's first hearing in order to obtain missing records relating to Booker's mental impairments, and continued the hearing approximately one month later.  Tr. 974, 979. Thereafter, the ALJ issued an unfavorable opinion, but the Appeals Counsel remanded for further consideration, necessitating the third hearing.  Tr. 547-49.

10, 2008, the ALJ issued a decision denying Booker's applications.  Tr. 23-35.  On November 21, 2009, the Appeals Council declined to grant review.  Tr. 7.  Booker filed a complaint before this Court on January 20, 2010.[4]  Supporting and opposing briefs were submitted and this case became ripe for disposition on November 22, 2013 when Booker declined to file a reply brief.

Booker appeals the ALJ's determination on two grounds: (1) the ALJ improperly evaluated the available opinion evidence in concluding that substance abuse contributed to Booker's disability, and (2) the ALJ erred at Step Three of the sequential evaluation process.  For the reasons set forth below, the decision of the Commissioner is affirmed.

## Statement of Relevant Facts

Booker was 38 years of age at his alleged onset date; he has obtained a GED, and is able to read, write, speak, and understand the English language.  Tr. 166, 174.  Booker's past relevant work included work as a recycling sorter and a small parts assembler, both of which were classified as light work.  Tr. 1020.  Booker also had past relevant experience as a laborer of stores, which is classified as medium work, and as a construction worker II, which is classified as heavy work.  Id.  All four of Booker's past relevant jobs were unskilled.  Id.

---

[4] By Order dated April 28, 2010, this case was remanded to the Commissioner pursuant to the sixth sentence of 42 U.S.C. § 405(g).  On May 7, 2013, the case was reopened after missing evidence was located.

A.    **Booker's Mental Impairments**[5]

Booker presented to Steve Mehl, M.A. at Susquehanna Counseling for

psychotherapy on February 28, 2005.  Tr. 697.  At that appointment, Booker

seemed angry and depressed; he had "paranoid tendencies" and believed his parole

officer was trying to send him to jail.  Id.  Booker reported previous drug use, but

stated that he had ceased using drugs in the mid 1990's.  Id.  Booker was assessed

as having a "low frustration tolerance."  Id.  One week later, on March 8, 2005,

Booker presented to the York Hospital emergency room.  Tr. 818.  There he stated

that he had ceased drinking in January 2005.  Id.  Booker felt depressed and was

not sleeping well, but denied any intent to harm himself.  Id.

On March 24, 2005, Booker attended an initial psychological intake with

Anthony Russo, M.D.  Tr. 264-71.  Booker admitted that his "drinking [was]

becoming a problem," but claimed to have quit drinking in January 2005.  Tr. 264.

Booker reported that, prior to quitting, he had been drinking approximately one

pint of rum each week.  Tr. 265.  Booker complained of night terrors and an instant

reaction to anger; he stated that "little things set [him] off."  Tr. 264.  Booker

appeared anxious, angry, and depressed.  Tr. 267.  His behavior was defensive and

hostile, but simultaneously appropriate, interested, and attentive.  Id.  Booker was

---

[5] Though Booker has been diagnosed with several physical impairments, his appeal concerns
only his mental impairments and issues surrounding his use of alcohol. Thus, records relating to
Booker's physical impairments will only be discussed as necessary to evaluate the relevant
issues on appeal.

anxious, irritable/angry, and depressed.  Id.  His thought content was slowed, but his thought organization was intact, logical, and coherent.  Id.

Booker had occasional auditory hallucinations, as well as suicidal and homicidal ideations.  Tr. 268.  He had a clear sensorium, intact memory, and was alert and oriented.  Id.  Booker was able to perform serial sevens and threes well; his decision making ability was intact, though his judgment and insight were only fair.  Id.  Dr. Russo diagnosed Booker with Major Depressive Disorder, recurrent and non-psychotic, organic mood disorder, PTSD, borderline personality disorder, and polysubstance abuse disorder.  Tr. 269.  Dr. Russo assigned a GAF score of forty.[6]  Id.

On April 13, 2005, Mr. Mehl reported that Booker was still drinking, but did not "see it as a problem because he can't afford to drink a lot."  Tr. 699.  Booker reported that he only drank with friends on the weekend.  Id.  Mr. Mehl believed that Booker was "in denial – [he was] not interested in working on his substance abuse problem."  Id.  Mr. Mehl stated that, although Booker was depressed, he was not taking his medications regularly.  Id.

Booker continued to report to Dr. Russo throughout 2005 and into June 2006.  Tr. 242-63.  At these appointments, Booker was generally cooperative, had

---

[6] A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

normal speech, fair insight and judgment, and no suicidal or homicidal ideation. Id. He was consistently alert and oriented, and had normal concentration. Id. Booker had intact thought associations, a logical thought process, intact memory, and no impairment to his thought content. Id. However, Booker was often in moderate or severe distress, routinely had a dysphoric affect, and was often anxious, irritable, and depressed. Id. At each of these appointments, Dr. Russo assigned a GAF score of forty and diagnosed Booker with polysubstance abuse disorder, PTSD, major depressive disorder, and borderline personality disorder. Id. In late 2005, Dr. Russo opined that, due to his impairments, Booker was temporarily disabled until December 31, 2006. Tr. 646-47.

On October 12, 2005, Booker returned to Mr. Mehl; on that day, two staff members reported smelling "strong alcohol." Tr. 702. These workers believed that Booker was under the influence of alcohol. Id. The next day, Mr. Mehl confronted Booker with this information. Tr. 702-03. Booker admitted to drinking, but "refused to state the amount [and] demanded [they] not talk about his drinking." Tr. 702. Booker became tearful and "used self-pity as an excuse." Tr. 703. Booker then became withdrawn and stopped participating in the session. Id.

At a January 4, 2006 session with Mr. Mehl, Booker reported that he had gotten into a fight with his girlfriend's brother. Tr. 705. According to Mr. Mehl, "alcohol [was] involved." Id.

On January 20, 2006, Booker presented to Daniel Aikins, Psy.D. for a neuropsychological evaluation.  Tr. 225-33.  Booker reported a history of "drinking about a case of alcohol per week," and reported that "[o]ccasionally, he will drink a bottle of liquor."  Tr. 225.  Booker had a euthymic mood with a blunted affect and was initially guarded.  Tr. 227.  His thought processes were normal and appropriate to content, and he put forth adequate effort in the assigned tests and tasks.  Id.  Dr. Aikins stated that Booker was "evasive about his last drug use" but used 1997 as an "anchor" for his sobriety.  Id.  Dr. Aikins found that Booker's "general cognitive ability is in the Average range of intellectual functioning."  Id.

Objective tests revealed that Booker was "prone to missing relevant information as he scans his environment – information that may be necessary for appropriate responses to people and situations."  Tr. 228.  Furthermore, Booker's skill in "processing visual material without making errors" was below average.  Tr. 229.  Dr. Aikins found that Booker suffered from severe depression and high anxiety with physical manifestations, such as trembling hands, tingling, sweating, and an inability to relax.  Tr. 230.  Booker was "quite skeptical of people" and had a strong negative self-evaluation; he saw himself as a failure and did not see much of a future for himself.  Id.

Dr. Aikins opined that Booker's greatest hindrance to his ability to work was "his ability to relate to other people," and believed that Booker would need to maintain sobriety to achieve career success.  Tr. 231.  Dr. Aikins believed that Booker's mood needed to be managed better, and opined that Booker must avoid heavy manual labor, jobs that required hand-eye coordination under time constraints, and jobs that required attention to fine details.  Tr. 232.  Dr. Aikins diagnosed Booker with depressive disorder, PTSD, and polysubstance dependence; he assigned a GAF score of fifty.[7]  Tr. 231.

On November 6, 2006, Booker presented to Francis Daly, Jr., M.D. for an initial psychiatric evaluation.  Tr. 336-40.  Booker stated that he had been off of drugs for two or three years, but later stated that he had been off of drugs since 1998.  Tr. 337, 338.  Booker reported that he still occasionally drank alcohol.  Tr. 337.  On a scale from one to ten, Booker rated his depression as a ten, and his anxiety as a nine.  Id.  Booker related that Cymbalta had helped with some of his mental impairments, although he still had symptoms of depression.  Tr. 338.

At the appointment, Booker made appropriate eye contact and was cheerful at times.  Tr. 339.  He had a euthymic mood, but was restless and had only fair insight and judgment.  Id.  Though Booker's flow of thought was generally

---

[7] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

coherent, it was at times circumstantial and he had some loose associations.  Id.

He also expressed "some" paranoid delusions.  Id.  Dr. Daly diagnosed Booker

with major depressive disorder, recurrent with psychotic features; cannabis, heroin,

and cocaine abuse in sustained full remission, and; alcohol abuse in sustained

partial remission.  Id.  Dr. Daly assigned a GAF score of thirty.[8]  Id.

Booker returned to Dr. Daly on November 20, 2006.  Tr. 332-33.  Booker

was cooperative with a fair mood and slightly depressed affect.  Tr. 332.  His

insight and judgment were fair, and his speech was coherent.  Id.  However,

Booker complained that he was tired, and was no longer taking Cymbalta because

his insurance stopped paying for the medication.  Id.  Dr. Russo assessed Booker

with a GAF score of 30.  Id.

On January 5, 2007, Dr. Daly noted that Booker "revealed that he is

drinking."  Tr. 341.  Booker had a euthymic affect and a fair mood.  Id.  However,

Dr. Daly observed that Booker's insight and judgment were poor.  Id.  Dr. Daly

assigned a GAF score of forty.  Id.  Dr. Daly no longer listed Booker's alcohol

abuse as being in remission.  Id.  On January 28, 2007, Robert Stremmel, D.O.

responded to a set of interrogatories mailed by Booker's attorney.  Tr. 520.  In his

responses, Dr. Stremmel opined that Booker was limited to working less than forty

---

[8] A GAF score of 21–30 represents behavior considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment or inability to function in
almost all areas. Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev.,
2000).

hours per week at a sedentary level, and Booker's medications significantly limited his ability to maintain concentration, persistence, and pace.  Id.

On March 29, 2007, Booker reported that his depression rated as a five on a scale from one to ten.  Tr. 517.  Booker complained that job stress was adding to his depression; Dr. Daly discussed the importance of Booker finding a new job to address his back pain and depression.  Id.  Booker was cooperative, his speech was normal, and he had an "okay" mood and euthymic affect.  Id.  His insight and judgment were listed as fair.  Id.  Dr. Daly assessed a GAF score of fifty.  Id.  On April 12, 2007 and June 25, 2007, Booker's condition had not improved, and Dr. Daly continued to assess Booker with a GAF score of fifty.  Tr. 514, 515.  At a July 15, 2007 visit to York Memorial Hospital, Booker reported that he drank occasionally, though his last drink had been on July 10, 2007.  Tr. 414.  Booker stated that he had not "drank heavily for quite some time."  Id.

On July 31, 2007, Booker returned to Dr. Daly for a medication check.  Tr. 513.  Booker's mental status was stable, his mood was good, and he had an appropriate affect.  Id.  His speech was normal, his thought content was benign, and his insight and judgment were fair.  Id.  Dr. Daly listed Booker's polysubstance abuse as being in remission, and assigned a GAF score of sixty.[9]  Id.

---

[9] A GAF score between 51 and 60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  See, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

On November 12, 2007, Booker presented to Dr. Daly for the final appointment contained within the administrative record.  Tr. 512.  At this appointment, Booker noted that he was sometimes working ten hour days, and complained of being tired and cranky.  Id.  His mental status was stable, he had no suicidal ideation, and his insight and judgment were fair.  Id.  Dr. Daly again diagnosed Booker with polysubstance abuse, in remission, and assessed Booker as having a GAF score of seventy.[10]  Id.  On May 6, 2008, Dr. Stremmel opined that Booker was permanently disabled.  Tr. 219.  Dr. Stremmel listed Booker's primary diagnosis as lumbar disc syndrome, with a secondary diagnosis of bipolar disorder, sleep apnea, gout, and high blood pressure.  Id.

### B.   Residual Functional Capacity Assessments

On February 8, 2006, Dr. Russo drafted a letter outlining Booker's medical issues.  Tr. 695.  Dr. Russo listed Booker's diagnoses as: major depressive disorder, organic mood disorder, borderline personality disorder, and polysubstance abuse.  Id.  Dr. Russo assigned a GAF score of forty, and opined that, at the time of the letter, Booker was "unable to work full time because of his mental/physical diseases . . ."  Id.

---

[10] A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning fairly well with some meaningful interpersonal relationships.  See, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

On April 27, 2007, John Gavazzi, Psy.D., reviewed Booker's medical records and offered a residual functional capacity assessment.  Tr. 366-68, 452-64.  Dr. Gavazzi believed that Booker was moderately limited in his ability to: (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) accept instructions and respond appropriately to criticism from supervisors, and (4) interact appropriately with the general public.  Tr. 366-67.  Dr. Gavazzi believed that Booker suffered from depressive disorder, PTSD, personality disorder, and polysubstance abuse.  Tr. 368.  He opined that Booker could "make simple decisions" and "perform simple, routine, repetitive work in a stable environment."  Id.

Dr. Gavazzi also considered Listings 12.04, 12.06, 12.08, and 12.09.  Tr. 462.  Under Paragraph B of those listings, Dr. Gavazzi opined that Booker suffered from mild restrictions in his activities of daily living, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and had suffered from no episodes of decompensation.  Id.  Dr. Gavazzi also opined that the evidence did not establish the presence of Paragraph C criteria under those listings.  Tr. 463.

On June 25, 2007, Dr. Daly submitted an assessment of Booker's mental impairments as applied to Listing 12.04.  Tr. 467-70.  Dr. Daly opined that Booker met the requirements of Paragraph A.  Tr. 469.  Dr. Daly opined that Booker met

the Paragraph B criteria as well.  Tr. 468.  He believed that Booker suffered from marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, and marked restrictions in maintaining concentration, persistence, or pace.  Id.

On October 25, 2007, Barry Hart, Ph.D. conducted a psychological examination of Booker and offered a mental residual functional capacity assessment.  Tr. 488-95.  Booker reported a history of polysubstance abuse, but stated that he had ceased all drug use approximately ten years prior.  Tr. 489. Booker reported drinking two to three times per week; he drank one-half to one pint of rum each time he drank.  Id.  Dr. Hart did not believe that Booker was a good historian, due at least partially to his drowsiness during the appointment.  Tr. 488.  Dr. Hart noted that Booker avoided eye contact and had difficulty answering questions directly.  Tr. 490.

Booker worried "about his girlfriend's brothers being after him, but this did not reach delusional proportions."  Id.  He denied any perceptual disturbances or suicidal or homicidal ideation.  Id.  Booker's speech was clear and coherent, though it was not always goal directed.  Tr. 491.  Dr. Hart believed that Booker had a "reasonable amount of insight" into his condition, and "appeared to present as reliable as he could."  Id.

Dr. Hart diagnosed Booker with major depressive disorder and a history of polysubstance abuse. Tr. 491-92. Dr. Hart assigned a GAF score of sixty, but opined that Booker's prognosis was "quite guarded" due to the fact that Booker continued to struggle with depression "despite being on appropriate medication and in therapy." Tr. 492. Dr. Hart opined that Booker's "concentration is reasonable only, but good enough to do manual labor." Tr. 493. He further opined that Booker was moderately impaired in his ability to interact appropriately with the public, and was slightly impaired in his ability to respond appropriately to changes in a routine work setting. Tr. 494.

On January 14, 2008, Dr. Daly opined that Booker suffered from marked limitations in his ability to: (1) remember locations and work-like procedures, (2) understand and remember detailed instructions, (3) carry out detailed instructions, (4) complete a normal workday or workweek without interruptions from psychological symptoms, and (5) perform at a consistent pace without and unreasonable number and duration of rests. Tr. 502-03.

Dr. Daly further opined that Booker was moderately limited in his ability to: (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (3) work in coordination with or proximity to others without distraction, (4) interact appropriately with the public, (5) accept instructions and

respond appropriately to criticism from supervisors, (6) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (7) respond appropriately to changes in the work setting.  Tr. 502-04.  Dr. Daly stated that these limitations had been in existence since the onset of Booker's treatment and were expected to continue for at least one year.  Tr. 504.  Dr. Daly further stated that none of the limitations were caused by substance abuse.  Tr. 505.

### C.   Medical Examiner Testimony

At Booker's third administrative hearing on January 29, 2008, Robert Brown, Jr., M.D. was called to offer testimony.  Tr. 1005-17.  Dr. Brown was board certified in internal medicine, psychiatry, and forensic psychiatry.  Tr. 1005. Dr. Brown stated that, based on the objective medical evidence, he was able to render an opinion on Booker's mental impairments.  Tr. 1006.  He noted that the objective evidence established issues with depression and PTSD, although these had "been complicated by [Booker's] substances abuse."  Tr. 1007.  Dr. Brown also noted that Booker's GAF scores had been as low as thirty, although his last GAF score was seventy, which indicated "mild symptoms."  Id.

Dr. Brown stated that, when Booker first began therapy, he "was using substances."  Tr. 1008.  However, Booker "changed some of that such that [his doctors] were able to call it polysubstance abuse in remission, and he started taking better care of himself . . ."  Id.  Dr. Brown believed that these changes led to

Booker's improved condition, as well as his ability to work for up to ten hours per day on a part-time basis.  Id.  Dr. Brown noted that Booker was "still drinking, at least heavily enough to get into a fight . . . on January 4 of '06."[11]  Id.

When asked what effect Booker's drinking had on the severity of his mental impairments, Dr. Brown replied that it "adversely affected it, in my opinion, Judge, as it always does."  Tr. 1009.  Dr. Brown opined that, when Booker stopped drinking, or drank less, and started taking "better care of himself," his condition improved.  Id.  Dr. Brown believed that Booker's "drinking [was] material to his disability[.]"  Id.  Dr. Brown noted that some doctors had previously opined that Booker was disabled.  Tr. 1010.  However, he stated that these opinions were rendered during a period when Booker "was more disabled" than he was at the time of the administrative hearing; Dr. Brown opined that he believed "alcohol was an important part of [Booker's disability] for a significant period of that time."  Id.

Dr. Brown believed that Booker's mental impairments did not meet or equal any Listing.  Id.  He opined that Booker was capable of "detailed and simple work."  Tr. 1011.  Without any substance abuse, Dr. Brown did not believe Booker was significantly limited in his concentration, persistence, or pace, or in his social functioning.  Id.  He further opined that Booker's only episodes of decompensation

---

[11] During this testimony, Booker stated that he had not been drinking during this fight.  Tr. 1009. Booker stated that his girlfriend's brother had entered Booker's home and "pulled a knife" on Booker.  Id.

16

related to alcohol use or diabetes.  Tr. 1011-12.  Dr. Brown believed that Booker's resumption of part-time work indicated an overall improvement in functioning.  Tr. 1012.

On cross-examination, Dr. Brown stated that he did not recall seeing any blood tests within the medical records that indicated drug or alcohol in Booker's system.  Tr. 1014.  During examination from Booker's attorney, it also became clear that Dr. Brown did not have all of Booker's medical records.  1013-17.

D.   **The Administrative Hearing**

At Booker's January 28, 2008 administrative hearing, Booker testified that he was not drinking "that much."  Tr. 1018.  Booker stated that he needed to take care of himself, and could not "afford to drink like [he] want[ed] to, or drink that much of anything else."  Id.  Booker stated that his drinking was "not an everyday thing."  Tr. 1019.  Booker also discussed his part-time work, and testified that, because of pain, he did not believe he could work more than approximately fifteen hours per week.  Tr. 997.  Booker testified that he did not sleep well due to his sleep apnea, and stated that his medication made him drowsy.  Tr. 1000-01.

After Booker testified, Cheryl Bustin, an impartial vocational expert, was called to give testimony.  Tr. 1019.  The ALJ asked Ms. Bustin to assume a hypothetical individual with Booker's age, education, and work experience who

was limited to light work[12] and had the capacity to stand for four hours, walk for

four hours, and sit for eight hours, but "would need to change position from

standing at least after an hour."  Tr. 1021.  The ALJ further stated that the

individual could only push or pull ten pounds and could not use foot controls with

more than ten pounds of weight.  Id.  The hypothetical individual could only

occasionally climb or crawl, and could not work from unprotected heights or

around hazardous machinery.  Id.  Furthermore, the individual was limited to

simple, repetitive and detailed work, and work involving no more than a moderate

pace and stress level.  Id.  Finally, the ALJ limited the hypothetical individual to no

contact with the general public or co-workers.  Id.

Ms. Bustin opined that, given these restrictions, the hypothetical individual

would be able to perform Booker's past relevant work as a small parts assembler.

Tr. 1021-22.  The individual also would be capable of performing three jobs that

exist in significant numbers in the national economy: a bench assembler, a hand

packer, and a table worker, quality control.  Tr. 1022-23.  Ms. Bustin testified that,

---

[12] Light Work is defined by the regulations of the Social Security Administration as work "with
frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some pushing and pulling of arm or leg controls.
To be considered capable of performing a full or wide range of light work, you must have the
ability to do substantially all of these activities. If someone can do light work, we determine that
he or she can also do sedentary work, unless there are additional limiting factors such as loss of
fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

if all of the limitations outlined by Dr. Daly were accepted as true, there would be no work in the national economy that an individual could perform.  Tr. 1023-25.

## Discussion

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera

Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not

substantial evidence if the Commissioner ignores countervailing evidence or fails

to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058,

1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for rejecting certain

evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the

record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability

insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc.

Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner

to consider, in sequence, whether a claimant (1) is engaging in substantial gainful

activity, (2) has an impairment that is severe or a combination of impairments that

is severe, (3) has an impairment or combination of impairments that meets or

equals the requirements of a listed impairment, (4) has the residual functional

capacity to return to his or her past work and (5) if not, whether he or she can

perform other work in the national economy.  See 20 C.F.R. § 404.1520.   The

initial burden to prove disability and inability to engage in past relevant work rests

on the claimant; if the claimant meets this burden, the burden then shifts to the

Commissioner to show that a job or jobs exist in the national economy that a

person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

### A.      The ALJ's Conclusions Regarding Substance Abuse

On appeal, Booker argues that the ALJ relied on conclusory and incompetent medical testimony in finding that Booker was not disabled due to alcohol abuse.  Booker argues that Dr. Brown's testimony at the administrative hearing was flawed because he was not in possession of every medical record when he rendered his opinion, and because he assumed that certain past events were related to alcohol consumption.  Furthermore, Booker argues that the ALJ erred in his treatment of certain medical evidence that indicated, absent alcohol abuse, Booker would be disabled.

### i.      Dr. Brown's Testimony

During Dr. Brown's testimony, it became apparent that Dr. Brown was missing at least some of the available medical records.  Tr. 1013-17.  Though it is not clear what records were missing, it appears that Dr. Brown was missing some of Drs. Nachtigall's and Stremmel's records relating to Booker's physical impairments.[13]  Tr. 1014-17.  None of these records significantly impacted the

---

[13] Booker argues that Dr. Brown did not have Dr. Daly's records indicating that Booker was in full remission from alcohol use. To the contrary, Dr. Brown did have access to these records, and relied substantially upon them. Dr. Brown noted that Booker's "most recent GAF score was 70," a fact that was contained in Dr. Daly's last treatment record. Tr. 512, 1007-08. Dr. Brown also relied upon the fact that Booker had changed his behavior enough that Dr. Daly diagnosed his polysubstance abuse as "in remission." Tr. 512-13, 1008. This information was critical in Dr.

determination of Booker's alcohol abuse.  Dr. Nachtigall's records were strictly related to Booker's physical impairments, and had no relevance on the impact that Booker's alcohol abuse had on his mental impairments.  Tr. 465-70, 479-85.

Dr. Stremmel offered two assessments that rendered Booker disabled.  Tr. 219, 520.  Neither assessment would likely have impacted Dr. Brown's opinion. The first assessment was offered on January 28, 2007.  Tr. 520.  This was a time during which Booker was still consuming alcohol, or had just recently ceased drinking alcohol.  Tr. 341.  Dr. Brown specifically mentioned medical opinions from the period of time when Booker was drinking, and stated that these opinions were influenced by Booker's alcohol consumption and were not indicative of Booker's functional abilities absent alcohol abuse.  Tr. 1010.

Dr. Stremmel's second opinion, given in May 2008, was devoid of any explanation for his statement that Booker was permanently disabled, and was based primarily upon Booker's physical impairments.  Tr. 219.  Additionally, the only mental impairment that Dr. Stremmel listed was bipolar disorder; neither the ALJ nor Dr. Brown felt that Booker suffered from bipolar disorder.  Tr. 26, 1007. Consequently, Dr. Stremmel's second opinion likely would not have influenced Dr. Brown's conclusions.

---

Brown concluding that Booker's disability was substantially impacted by his alcohol dependence. Tr. 1009-11.

Booker's second argument, that Dr. Brown: (1) erroneously assumed alcohol contributed to a fight in 2006; (2) erroneously assumed that Booker's DUI offenses were committed during the relevant time period, and; (3) stated that Booker had never said he stopped drinking, does not warrant remand.

Booker testified that he was not drinking during the 2006 fight, and he argues on appeal that this testimony was uncontroverted. Tr. 1008-09. To the contrary, Mr. Mehl reported at a January 4, 2006 psychotherapy session that "alcohol [was] involved" in the fight. Tr. 705. Additionally, while Dr. Brown did state that Booker "may have had some DUI's" in the past, this statement was not material to Dr. Brown's overall findings. Tr. 1009. Rather, Dr. Brown opined that drinking always adversely affects an individual's mental impairments. Id.

Finally, while Dr. Brown stated that he did not "think [Booker] had said he stopped" drinking alcohol, this statement was not erroneous. Booker's own testimony confirmed that he was still drinking at the time of the administrative hearing.[14] Tr. 1006, 1018-19. Thus, Dr. Brown did not err in making this statement. Additionally, there was a significant amount of evidence that Booker

---

[14] Contrary to Booker's argument, the ALJ did not rely on this testimony to conclude that Booker was still drinking, and therefore not disabled. While the ALJ used stock language such as "If the claimant stopped the substance abuse" in the headings of his Opinion, the Opinion itself makes clear that the ALJ believed Booker had ceased abusing alcohol. Thus, the ALJ gave greater weight to Dr. Daly's records and GAF scores from mid to late 2007 than the records and scores from 2006 and early 2007. Tr. 33. In that vein, the ALJ stated "I assign great weight to [Dr. Daly's] opinion in November 2007 . . . as that was more consistent with his treatment notes and shows the claimant had improved significantly after a longer period of sobriety." Id.

was abusing alcohol during 2005 and 2006, with numerous notations in his medical records confirming this fact.  Tr. 225, 337, 341, 414, 699, 702, 703, 705. Consequently, Dr. Brown's testimony as a whole was not flawed, and the ALJ did not err in assigning this opinion "great weight."  Tr. 32.

ii.   <u>ALJ's Treatment of Treating Physician Opinions</u>

Next, Booker argues that the ALJ erred in not according more significant weight to the opinions of Booker's treating physicians.  Dr. Russo's treatment records contained numerous GAF scores; every GAF score was forty, indicating serious symptoms.  Tr. 242-71.  Dr. Russo also submitted a letter detailing diagnoses for Booker, listing a GAF score of forty, and opining that Booker was unable to work due to his impairments.  Tr. 695.  The ALJ assigned "great weight" to Dr. Russo's opinions, with the significant caveat that "they [be] taken in the context that the claimant was actively abusing alcohol."  Tr. 32.  Therefore, the ALJ found that Dr. Russo's opinions were indicative of Booker's limitations while abusing alcohol, and were not "probative of what the claimant's functioning is absent substance abuse."  <u>Id.</u>

The ALJ's decision is supported by substantial evidence.  Booker's medical records from the time that he received treatment from Dr. Russo indicate that Booker was still abusing alcohol.  At his initial appointment with Dr. Russo, Booker admitted that alcohol was becoming a problem, though he claimed to have

quit drinking two months prior to the appointment. Tr. 264. However, less than one month later Booker reported that he was still drinking, but did not "see it as a problem because he [couldn't] afford to drink a lot." Tr. 699. On October 12, 2005, Booker smelled of alcohol, and staff member believed he was under the influence. Tr. 702. The next day, Booker admitted that he had been drinking. Id. On January 4, 2006, Booker admitted that he had been in a fight, and that "alcohol [was] involved." Tr. 705. On January 20, 2006, Booker reported that he would occasionally "drink a bottle of liquor," and on November 6, 2006, Booker again reported that he occasionally drank alcohol. Tr. 225, 337.

In addition to this evidence of alcohol consumption, Dr. Russo listed polysubstance abuse disorder as an ongoing diagnosis at every appointment with Booker. Tr. 242-71. Furthermore, in Dr. Russo's letter dated February 8, 2006, he opined that Booker had "severe/significant comorbid psychopathology per his diagnosis that exacerbated his depression and compromised his functional capacities." Tr. 695. Dr. Russo had listed polysubstance abuse disorder as one of Booker's diagnoses; therefore, this statement makes clear that Dr. Russo believed polysubstance abuse exacerbated Booker's other mental impairments.

This substantial evidence supports the ALJ's conclusion that Dr. Russo's opinions were not probative as to Booker's functional capacity absent alcohol abuse. Therefore, the ALJ did not err in his consideration of Dr. Russo's opinion.

Dr. Daly detailed several functional limitations and specifically opined that Booker's limitations were not "related" to alcohol or drug abuse.  Tr. 505.  The ALJ assigned "limited weight" to Dr. Daly's opinion, reasoning that it was "inconsistent with Dr. Daly's GAF scores of 60 to 70 in more recent treatment notes."  Tr. 32.  The ALJ also found it significant that Dr. Daly had previously stated that he "did not think the claimant would be able to get disability."  Id.  The ALJ correctly noted that Dr. Daly's opinion was internally consistent with the GAF scores he assigned to Booker.

Dr. Daly opined that Booker had marked limitations in several areas, including his ability to complete a normal workday and workweek, and his ability to remember locations and work-like procedures.  Tr. 502-03.  However, a GAF score of seventy, which Dr. Daly assigned Booker in their last appointment, indicates only "mild symptoms or some difficulty in . . . occupational . . . functioning."  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).  This is inconsistent with Dr. Daly's opinion that Booker would be incapable of finishing a workday and workweek "without interruptions from psychologically based symptoms" and that Booker would be unable to "perform at a consistent pace without an unreasonable number and length of rest periods."  Tr. 503.  Consequently, the ALJ did not err in his treatment of Dr. Daly's opinions,

and the ALJ's treatment of the relevant medical opinions as a whole was supported

by substantial evidence. [15]

B.     **The ALJ's Findings at Step Three**

Lastly, Booker argues that the ALJ erred in failing to consider whether his

mental impairments meet or equal Paragraph C of Listing 12.04.  The

Commissioner in turn argues harmless error.  To be considered disabled at step

three, an impairment or combination of impairments must meet or medically equal

an impairment listed in the Social Security Administration's Regulations.

Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992).  "'For a claimant to

show that his impairment matches a listing, it must meet *all* of the specified

medical criteria.  An impairment that manifests only some of those criteria, no

matter how severely, does not qualify.'"  Id. (quoting Sullivan v. Zebley, 493 U.S.

521, 529–30 (1990)) (emphasis in original).

In order to satisfy Paragraph C of Listing 12.04, and individual must have a

medically documented "history of a chronic affective disorder of at least 2 years'

duration that has caused more than a minimal limitation of ability to do basic work

---

[15] Booker also argues that Borderline Personality disorder may cause an individual to abuse
alcohol or drugs, and thus this disorder cannot be separated from alcohol abuse.  Individuals
afflicted with Borderline Personality Disorder "may gamble, spend money irresponsibly, binge
eat, abuse substances, engage in unsafe sex, or drive recklessly." Diagnostic and Statistical
Manual of Mental Disorders, 707 (4th ed., Text rev., 2000). However, there is no indication here
that Booker's Borderline Personality Disorder contributed in any way to his prior substance
abuse, and no doctor ever suggested that Booker's mental impairments contributed to his
substance abuse.  Consequently, Booker had not satisfied his burden of proof as to this argument.

activities, with symptoms or signs currently attenuated by medication or psychosocial support." 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04C. Additionally, the individual must meet one of three other criteria: (1) repeated episodes of decompensation, each of extended duration; or (2) a "residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate;" or (3) a current "history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." Id.

Booker has not had any episodes of decompensation as required by subparagraph one. Tr. 462. There is no suggestion in the administrative record that "even a minimal increase in mental demand or change in the environment" would cause Booker to decompensate as required by subparagraph two. To the contrary, while Booker was initially unemployed when he filed for benefits, he later obtained a job where he worked part-time for as many as ten hours a day. Tr. 995-97. This work activity shows that Booker was capable of handling at least some change in his environment or increased mental demand without decompensating. Finally, Booker lived alone for a portion of the relevant period, and later lived in an apartment with several roommates. Tr. 137, 663-65. Thus,

the evidence contained within the administrative record supports a conclusion that Booker was able to live outside of a highly supportive living arrangement.

Additionally, Dr. Gavazzi opined that Booker did not meet the requirements of Paragraph C of Listing 12.04, and Dr. Brown opined that Booker did not meet or equal a listing. Tr. 463, 1010. The ALJ assigned "great weight" to both of these opinions, further supporting the conclusion that Booker did not meet or equal Paragraph C of listing 12.04. Tr. 32-33. Consequently, though the ALJ did not consider Paragraph C of listing 12.04 in his Opinion, there is no indication that this error affected the outcome of the case, and remand is not warranted based on this error. See, Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

## Conclusion

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An appropriate Order will be entered.